Case number 23-3270, Clarence Fry v. Tim Shoop, argument not to exceed 30 minutes per side. Mr. Vincent, you may proceed for the appellant. Good morning. Good morning, Chief. Your Honors. May it please the Court. My name is Adam Vincent. I'm here on behalf of Clarence Fry. I'd like to reserve eight minutes for rebuttal. What I'd like to talk about this morning is the right to testify and how Clarence Fry was denied that right when his trial counsel affirmatively misled the trial court. The issue is a pretty straightforward application of Strickland. Because of counsel's deficient performance, Fry was prejudiced. His constitutional privilege was denied him. This Court should not and need not defer to the State Court decisions below because they are based on an unreasonable determination of the facts in light of what we have in the record evidentiarily. Can I just orient myself there? So you're acknowledging AEDPA applies, but you're saying the key problem are fact findings? Yeah. The key component is the determination of the fact below, and the State Court's below, and the District Court. Yes. Our first estimate for this Court to vacate Fry's conviction and send it back for a new trial. Alternatively, we would ask this Court to remand the matter to the District Court for reasonable determinations of facts based upon what is in the record or even additional fact development if the Court felt that was appropriate. The Supreme Court tells us that the most important witness for the defense is often the defendant himself. That's especially true in a case like Fry's where the dispute turns not on who committed the act. There was never any dispute that Fry himself was the one who caused Tamela's death. It turns on whether or not the act itself was aggravated murder. This was defense's theory of the case. This was the theory of the case presented to the jury even from opening argument that Fry himself would testify, that the defense would be seeking a lesser included instruction of manslaughter. The defense spent quite some time in opening discussing what manslaughter meant for the jury so they would be sort of prepared to hear that evidence. In a case like Fry's where there is no witness to the crime or to describe sort of the events that led up to Tamela's death except Fry himself, the only way the defense could present this theory to the jury and get the evidence before the jury would be through Fry's own testimony. I mean, one, I know you're aware of this. I don't want to be impatient, but I guess the questioning suggests it. I mean, it's not a cost-free, I mean, it's not like testifying is this good that's here and it's only a good without anything on the other side. And, you know, I didn't think it was crazy for his counsel to let him know the risk given the statements that had come in, you know, he's glad she died. There were some unfortunate statements including stuff that showed he had a propensity for certainly anger and I think you would say violence. So why is it, I mean, it seemed like he was ambivalent. It does seem that the evidence shows ambivalence by him, but I don't know. I have a really hard time understanding why it's so obvious he really did want to testify given the competing arguments. I think it could have really hurt him. In fact, I've seen this exact type of case where the ineffective assistance claim is that they let him testify because it was so devastating what the cross did. I hear you, Your Honor, and I guess we've got a few questions for me in there. I'm going to try to address them in turn. So the first point you raised about how it's not a, you know, sort of unqualified good, right? It's not always a great idea for the defendant to testify. We all know that. Defense attorneys know that. And that's, of course, why counsel often advises their clients not to testify. We know in this case that counsel advised Frye not to testify. But that verb is really important, I think, because all counsel can do is make that advice. They can advise their client not to testify. They cannot unilaterally say you won't testify. They can't make that decision for the client. They can't waive that right for the client independently of the client's wishes. And what we run into here is that the evidence in the record certainly shows vacillation on Frye's account in terms of whether or not he wanted to testify. That's, in fact, uncontested. We know from the post-conviction evidentiary hearings, from his trial attorney's testimony there, from their handwritten notes that six months before the trial, Frye really, really wanted to testify. At the top of trial, he really wanted to testify. Again, this comes through in their opening when they discuss. They say, I think it's, quote, Clarence has been waiting a long time to come here and tell you his story, sort of indicating to the jury that they're going to hear from Frye. And, again, they spend quite a bit of time in opening talking about manslaughter and how they're going to seek a lesser-included instruction. Well, if defense counsel had called him against his will, that would be a worse sin than what you're proposing here because the defendant did not want to testify. And didn't he send a message or something to the court and say he didn't want to testify? Are you asking if the defendant in this case had sent a message to the court saying he didn't want to testify? Yes. So deal with the fact issue of what you started by acknowledging ambivalence. Well, the reason for the ambivalence is it went both ways.  So I'm going to sort of walk us through it just a couple days in time. I think it helps just to understand the order of events. And I'll try to be brief because I know it's, you know. So we know at the top of trial, Frye wants to testify. We know come the close of the state's case, it's Friday, June 9th. Counsel represents to the court that Frye no longer wants to testify. The counsel says they can emphatically state that he does not want to testify. And Frye was there when he made that representation to the court. He was in the room, but that representation was made at sidebar. So at the close of the state's case, the jury was taken out of the room. The defense did some motions. He didn't hear the statement that he was surprised that his counsel made that statement to the court? Frye, I'm sorry, Your Honor. Is that your argument? That is part of it, yeah. This is not the only moment in time that's sort of critical, sort of walking us towards that so we understand everything. I thought it was accepted that he knew that his counsel had advised the court that he didn't want to testify, that he didn't say anything. But you're saying he didn't know about it? He did not know. So when the first time the court was informed that he did not want to testify that Friday, the statement was made at sidebar. The record indicates Frye did not know they had informed the court of this. Now, that following Sunday, his attorneys testified to and have notes that at, and I'm not saying that the attorneys were necessarily on that Friday evening misleading the court in that moment. The attorneys may have believed at that time Frye absolutely did not want to testify. Come that Sunday, this is before the defense has presented its case, we have handwritten notes from the attorneys and their testimony in post-conviction that Frye did want to testify. When they met with him at the jail, he did want to testify. And there's another handwritten note that says, reasons given not to. Now, fast forward to just the next Monday morning, so we're less than 24 hours from when Frye last told his attorneys that he wanted to testify. They represented the court again. He does not want to testify. And the most generous reading is that perhaps counsel believed earnestly he did not want to testify. But that was not the end of the trial court's inquiry. The trial court specifically stated, if there has been any vacillation whatsoever, I'll ask him on the record. Because the trial court wanted to do the right thing. It wanted to make sure that if there was any question of whether or not he wanted to testify or not, that it would make the inquiry on the record of him. When the trial court presents this question to trial counsel, they are silent about the fact that even within 24 hours before the question was answered, Frye had vacillated. Frye had wanted to testify even the day before. They were silent, or did they represent that there was no vacillation? They represented there was no vacillation. The exact exchange is— So that being silent, okay. I apologize, Your Honor. The trial court said, if there's any vacillation at all, I would ask him on the record. But you're representing to me that he is— All right. So you're just saying defense counsel lied to the court. Yes. And that exchange happened in Chambers outside of Frye's— I mean, outside of Frye's earshot. Following that exchange in Chambers, the defense presented their case in chief, which consisted of a single witness. And then they rested their case at sidebar, again outside of Frye's earshot. So the first time Frye knew definitively that his— and presumably that his right to testify had been sort of denied him was when moments later the trial judge announces to the courtroom both sides have rested their cases and then immediately launches into a description of closing arguments for the jury. At that point, does he talk to counsel and say, what's going on? So this is where we have to sort of look at the entirety of the record and not just this moment. Frye's relationship with his counsel was extremely negative. I'm sure you've seen this on the record, and if you haven't yet, you will see it. I mean, their relationship even before the jury was selected was really fraught. He did not trust them. He did not believe they were sort of listening to what he wanted. He had trouble with issues with the fact they weren't calling witnesses, that they ignored him. There's some choice words testified to in post-conviction between counsel and the attorneys that just suggest really there was a really bad relationship. And we know later on after the guilt phase when Frye waives mitigation, he sort of says in open court something like, I want to get this over with. I want to get back here on appeal, things that indicate that he has no real understanding of the process that's sort of happening around him and that he's engaged with, which also indicates that trial counsel never really explained things very well to him. I mean, the record is rife with information that indicates this relationship was really bad, and there's nothing to indicate that trial counsel ever sort of affirmatively told him, like, we are going to go waive this right for you. And I think the fact that when asked specifically if he had ever vacillated, and he vacillated within 24 hours, and that's uncontested. His attorneys in post-conviction testify that, yes, he vacillated. Yes, it had been that recent. Yes, that's what the handwritten notes mean from the day before. There's really the only reasonable explanation is that they did not want the trial court to make the inquiry of Frye because they were worried that he would, or they knew he would, assert his right to testify. Your Honor. What's the most egregious violation? Go ahead. What's the most egregious constitutional violation that the court did or the counsel did? Is it telling the court that the defendant didn't want to testify, or is it something else? I think the most egregious error counsel in this issue did was lying to the trial court to tell the trial court that he had not vacillated, which led to the deprivation of Frye's ability to testify in his own defense. And, again, when we think about how trial counsel had laid out for the jury that they would hear from Clarence that the only effective theory they had, the one they had presented to the jury in opening, the only way to get any of that in would have been through Frye's. I'm sorry to interrupt you, but do you think it was ineffective to urge him not to? To urge him not to, no. I don't think it can be ineffective to encourage your client to not testify or to testify necessarily. No, no. I'm saying in this case it strikes me as definitively very good advice to say do not testify here. And I'm asking whether you agree with me on that. Given what would have come in. I don't necessarily agree with you, and it is precisely because of defense's active theory of the case. And sort of what they had wanted to prove based upon their opening and their ask later for a manslaughter instruction. If defense's theory in this case was we don't have aggravated murder, we have voluntary manslaughter, they're going to have to show that to the jury. And, in fact, they didn't even get the instruction in the end because they didn't put on any evidence to support it because the only evidence they could have put on to support that instruction would have been Frye's testimony. Yes, which came with all the cross-examination. I mean, the part of this that is sometimes frustrating is just like, okay, let's close our eyes. Let's pretend that other stuff isn't there. Well, it's there. Whatever the relationship was, this was good advice on this record. Your Honor, I don't entirely agree. But, again, it is primarily because of if this is defense's sole theory, it's sort of the only functional theory in the trial that could avoid death besides mitigation. It's the theory that they have sort of set up for the jury. There's no way to get that theory through unless Frye testifies. If they had never wanted him to testify, never believed he would testify, had sort of pursued some other strategy during the guilt phase, it might make more sense. And I certainly don't disagree that perhaps Frye's testimony, you know, on cross-examination, anything can happen. And on this record, it's hard to say what exactly would have happened. But part of the right to testify is that the defendant's there in front of the jury. The jury can sort of hear their story, can judge the credibility for themselves, see them exposed to cross-examination, to hear them discuss, you know, answer the state's questions and sort of be sort of prodded and inquired upon. In the process, help the state meet its beyond reasonable doubt burden. Perhaps. Or, because the only source of the information or the evidence that would support a manslaughter instruction would have been from Frye, perhaps tell the story to the jury of the relationship between Frye and the victim, of sort of what happened on this day, and at least present the jury with what it was promised, that there is a possibility here for the jury to seriously consider. I'm sorry to interrupt again, but just to make sure I'm capturing the key point, which are the fact findings that are clearly erroneous? Oh, from below. So the state court fact findings that we're supposed to respect, so precisely which ones are they? Or is it one? There are a few. So we'll start with the state court's fact findings at the post-conviction, after the evidentiary hearing and post-conviction. The state trial court has heard testimony from the attorneys that this is the date of the handwritten note, yes, that's my handwriting, yes, that's what it means, yes, Frye vacillated. So it's uncontested in the record that Frye vacillated. And if Frye vacillated and attorneys affirmatively denied that to the trial court, then it's also uncontested that the attorneys misled the trial court. Well, wasn't the question by the trial court at the sidebar whether he wanted to testify now and whether he's vacillating now as opposed to in the past? So on that Friday before at sidebar, the question was more sort of in the moment. But that Monday morning when they asked about vacillation, the court said specifically if there has been any vacillation whatsoever. And I think that indicates has there been sort of has he been vacillating sort of at any point, but when you consider he had vacillated at least, I mean, within the 24 hours where the question was asked. You're making serious allegations of misconduct against the defense attorneys. And I know it's your job to represent your client here. And you need to argue deficient performance. But when you argue attorney misconduct, which is actually subject to disbarment, I think you've got to be a little bit more solid basis on your accusations and to say that it implies that the judge was asking whether he'd vacillated at any time in the past. As far as I can tell, the vacillation question was now as opposed to an implication at any time at all. And then you say that that shows that they lied to the court. I mean, that's serious. And I think it might be a little bit over the top. It's fair, Your Honor. And I think so let me flip it for you. Let me take the most generous reading of, I think, what counsel said to the court that day. You know, when the court asked on Monday morning if he has vacillated whatsoever, even if we don't assume the court means has he ever changed his mind at any point in the last six months or any point in the last week and a half of trial, less than 24 hours before the question was asked, he wanted to testify. And even if between when he told his attorneys he wanted to testify and that next morning, 12, 18 hours, whatever it is. But, you know, just even the word vacillation, right, it's not a black and white thing. It's just not yes and no. I mean, it could mean a lot of things. It could mean you could call it vacillation that he is reluctantly following counsel's advice. It's driving him crazy. He couldn't sleep last night. He's incredibly frustrated. He can't tell his story. But that is still his choice. Now, some people would say that's vacillation. Other people would say vacillation is when he's like equilibrium. He could change his mind at any second. I have no idea what he's doing. He says one thing one time. He says the next. So to say clearly erroneous, you've also got to capture what vacillation means. And I'm not sure it's as obvious as you're making it out, particularly in a world in which when his case ends, he knows he's not testifying now. It's not like the record shows he's calling counsel. He's raising his hand. He's saying, what's going on? So that might suggest that your theory of vacillation is different from another theory of vacillation, which is he just was very frustrated that he had to do this. But he still knew he was going to do it. And that's consistent with his not protesting. Well, there are sort of different potential definitions or understandings of vacillation. I would say when the question is presented to counsel, specifically, has he ever vacillated? There's almost – I mean, even under the sort of different sort of potential understandings or definitions of the word you just presented just now, even those, I think, when they're specifically asked by the trial court, has there been vacillation, would prompt at minimum a response of, for example, if counsel's understanding was – I disagree. If I had a client that couldn't sleep and was incredibly upset that they were not going to testify but had heard the pros and cons, had understood when I said all of the negatives that were going to come out on cross, I don't call that vacillation. I call that deep frustration, anxiety, and lots of other things one feels when you're being tried for a capital offense. But I don't call that vacillation. They're committed to a strategy. They're very frustrated. They have to follow. And you're calling – you're saying it's a lie to say that wasn't vacillation. I don't – that strikes me as one has to be careful about calling that a lie when it's – a lot of people would understand those terms differently in that setting. And for what it's worth, I think the trial judge was asking about the person who just couldn't make up their mind, just had no idea what they were going to do. And that's what I think the trial judge – I don't understand why the trial judge would think in a capital trial it was going to be easy for someone to not testify and that that was the definition of vacillation. You also just changed your question. Your remark there, you said the judge asked him, is he vacillating or has he ever vacillated? It's either present tense or past tense. What do you say the question was? Was it in the past tense or was it present? The question was if there – the court said if there has ever been any vacillation. Has there ever been? Yeah. It's either has there ever been any vacillation or if there has been vacillation whatsoever. The specific quote eludes me in the moment. I apologize, Your Honor. Then I will ask him on the record. And I think that suggests to counsel, regardless of what their definition of vacillation may be, that they need in that moment to represent to the trial court sort of what has gone on with their client. Okay. So, all right. Your argument is that in that response, the United States Constitution requires a, I guess, an evidentiary hearing at that point to determine whether he voluntarily is waiving his right. That question triggers a hearing. What's your U.S. Supreme Court case that says that? Your Honor, I wouldn't argue that that question triggers a hearing. I would argue that it just triggers a duty of counsel to be – of counsel's candor to the court to tell the court to answer the question honestly. What's your best U.S. Supreme Court case? I mean, this is an epic case. You have to cite a U.S. Supreme Court case on point, a holding. What's the Supreme Court holding you're citing? I mean, I think this is a straightforward application of Strickland. Counsel is deficient in misleading the court. Okay. Just a general standard without a specific case. There's no – I don't have a specific case for you on specifically when counsel lies to the court about or misleads the court about their client's right to testify. I think it's a straightforward application of Strickland. Counsel's performance is deficient. There's no sort of reasonable explanation for why counsel would mislead the trial court when the question has been asked with specificity. But I think prejudice comes in. You don't think you need a specific Supreme Court case to win an epic argument, if that's what you're arguing? I think you do. But I think the Supreme Court has – I think they've reversed our court when we are not able to cite a specific case. When we just cite general principles and grant habeas, I mean, I think the court's been quite clear that that's not enough. I think that's what you're relying on here. Well, in his defense, his main thing is clearly erroneous fact findings. So that has been his main argument. So I take him to – but you'll get your full rebuttal. And so we'll hear from the state. Thank you, Your Honor. Good morning. Thank you, Chief Judge Sutton, and may it please the court, Trane Robinson for the warden. The six claims the district court certified arise from three fact predicates. We've only talked about one so far this morning. His waiving his right to testify. The other two are Mr. Frey rejecting a plea offer as well as waiving his right to present mitigation. I just think it's helpful to think about this case in those three subcategories. If you don't mind, we're going to keep the focus solely on his argument. So that's all we're going to talk about this morning because that's all he talked about, and that's all we'll allow him to talk about on rebuttal. So as I hear him, the key thing he's come forward with, and I can understand why he's focusing us on this argument. He's saying, listen, there were some clearly erroneous fact findings with respect to whether he really waived his right to put on evidence. So we all agree he had this right. We all agree that if that right was denied, there would be a problem. So these are highly material fact findings. And what I take him to be saying is the trial court findings about ever vacillating are clearly erroneous given the notes, the evidence that came out in the state post-conviction hearing. The notes, other testimony suggesting ambivalence, other testimony saying the day before he was hoping not to testify. So you get the benefit of AEDPA. You have to show they really botched the fact finding. So how do you respond to this argument? Yes, Your Honor. I have three main responses. The most important one is that the attorney note triggered a post-conviction evidentiary hearing, two days of evidence about whether or not Frye wanted to testify, and the state post-conviction court found as a matter of fact that he did not. Maybe I'm asking too much, but do you remember were there more than who testified? Seven witnesses. Okay, so maybe just talk through that. Yes, happy to. So this was testimony over the course of two days, not back-to-back days, but separate by a few months. The first hearing was a July hearing when both capital co-counselors testified that Frye unequivocally on that over the weekend decided not to testify. And then the other person was Mr. Frye himself, and he took the contrary position that he still did want to testify. And the court weighed that evidence and sided with the attorneys that, no, Mr. Frye is not credible at all is what the court said, bordering on incredulous, whereas the attorneys were credible that Mr. Frye affirmatively waived that right. And all the attorneys were doing was relaying to the court, as Mr. Frye's faithful agent, exactly what they had discussed over the weekend in private client-counselor meetings. So the state post-conviction court made that finding a fact. That's a 2254E1 finding that's not clearly erroneous. And we know it's not clearly erroneous because the state heard the evidence over two days of post-conviction hearings. I can talk about the other one. What about his invocation of the notes? The notes are what triggered the post-conviction hearing. Right, right, right. So that suggests they're plausible. How did the trial court deal with the notes? Oh, yes, Mr. O'Brien explained that when he came into the meeting, that's Chapter 1 of that meeting, that he was thinking about still taking the stand. But the parenthetical on the note is reasons given for not testifying. Mr. O'Brien explained, Mr. O'Brien, excuse me, one of his counselors explained why that would be a bad idea, and Frye wisely listened to his attorney. And I take it the evidence shows the bad idea side of it was all the cross-examination evidence that would come in. Yes, exactly right. Mr. Frye taking the stand would have been detrimental to his case, and that was counsel's advice to him, and he followed that advice. And that's why when counsel shows up on Monday morning and has the in-chambers meeting, they're able to accurately represent to the court that he does not want to testify. There was some talk about precisely what that colloquy was in chambers. I'm happy to just read it and have it in front of me. The court asks, if there was any vacillation, the court would ask him on the record. But are you indicating to the court that he has decided of his own volition not to testify? The question is any vacillation rather than ever vacillation. Counsel told me the question was has he ever vacillated. I didn't think that was the question. It's whether there's any vacillation, which to me means present tense as opposed to past. I completely agree, Judge Griffin. I'm reading from page ID 6325. If there was any vacillation, the court would inquire. That's a present tense question. As of here this Monday morning, does your client want to testify? Counsel answered no. But there's another point, too. The direct question put to counsel was are you representing that he decided, quote, on his own volition that he doesn't want to testify? The answer to that, that was the question they said when they said that's correct. They were saying that that means, yes, Your Honor, we explained to our client why he should not testify, and he's decided to follow our advice. That was effective advice, not ineffective advice. I said I had three points. So far I've focused on the fact point, which I think kind of goes to Strickland's deficiency prong. There's also just a pure legal point, which is that there's no Supreme Court clearly established case law that would support this sort of inquiry requirement under the right to testify. Well, does the post-trial evidentiary hearing cure an error? I mean, say we think that it would have been better practice for the state trial judge to put this on the record at the time of trial to, you know, button down whether he wanted to testify or not. Even if that were error, is it cured because you have a post-trial hearing here? I think it is a cure. Maybe I would use the word clarification that the post-conviction court went in and checked whether he wanted to testify or not, and the answer was no. So that's taking your hypothetical that there was a problem. I guess I would push back on that, too, that there even was an inquiry requirement. I think the trial court maybe thought about doing that inquiry as a prophylactic, but it wasn't required by the Sixth Amendment. You know, I don't really like in-chambers discussions that are substantive, and I don't think that's a good practice at all. I think if there's any substance involved in the trial, it needs to be on the record, and it needs to be in court. I mean, you know, the jury's not going to be involved there, but it needs to be on the record rather than back in chambers, and then you have to piece it together later on, what was said and all this stuff. And the better practice, I think, of course, is to do it on the record. I tend to agree, Judge. But whether that's required by the Constitution, that's another question, and, you know, whether there's prejudice under Strickland is, of course, very important. Just to make sure I'm following the drift of this, the clearly established law point, so let's put the facts to the side. Is the clearly established law point now precisely how the state trial judge should have handled this? I just want to make sure I'm catching what you see as a reason why this fact dispute doesn't matter. That's what I take you to be saying, that, you know, even if the fact-finding was clearly erroneous, are you saying that still wouldn't get him relief? I think that's right. Go ahead. So the only clearly established law my friend has pointed to is the substantive right to testify on one's own behalf. But here, as I take the theory of this habeas claim, it's more of a procedural right to have an inquiry in open court, and there's no clearly established case to that point. In fact, this Court's cases, United States v. Weber, or just last year in a case called Carson v. United States, held the contrary. Those weren't 2254 cases, that one was a direct appeal and one was a 2255. But that's still Sixth Circuit precedent saying that there is no open inquiry requirement. And also – But, I mean, I guess this shows that the fact dispute could go in two directions. I took them to be saying one possibility was, hey, if you did just have lawyers lying, that would be a problem. You wouldn't run into a clearly established law point. It would be a problem if the lawyers just flat out lied about what the defendant wanted. But I guess you're saying there's another way of thinking about it. It wasn't exactly true, and the way this should have been solved was an open court inquiry of the defendant. I think it would be a problem, but not a problem of United States constitutional dimension. Is that right? I thought if you have a right to testify and your lawyers manipulate it so you don't by lying to the judge, I would have thought that's pretty easy. I think the defendant still has an opportunity in open court to assert his right. And so that's one point. Even if not prompted? He's supposed to get up and say, what's going on? I wanted to testify. What this court has said in Weber and then again last year in Carson, I can give you the citation to Carson. It didn't make it into our brief. That's all right. Okay. Anyways, what the court said was that silence is an act inconsistent with the exercise of the right from which you can infer a waiver. In conjunction with the attorney's representation that the client does not want to testify. So I think he still has a chance in open court when defense rests his case to assert his own right. I grant you that that would be unorthodox, but that is one way that the defendant still has it in his own hands to assert his right. But even setting this, I think this all goes to the deficiency prong of Strickland. But even setting that aside, we still have to get to prejudice. And remember, the question is what we're talking about now is whether the trial judge should have asked on the record whether he wanted to testify. And had that question been posed to Mr. Frey, well, we still have the state court finding a fact that the answer would have been no because he didn't want to testify. But even getting past that, had he taken the stand, he still has the obligation to show that there's a reasonable likelihood of a different outcome at the guilt phase of the trial. Given his testimony, I think that's not likely at all. Then you add on the EDPA standard, no fair-minded jurist could find a reasonable likelihood. So just to piece it out, one decides it's clearly erroneous that he was waiving his right to testify. And your point is he still has to show his testifying would have made a difference in the outcome. I mean, your answer at that point, you go back to the point that a lot of terrible evidence is going to come in on cross-examination. Is that how you – That's right. I think that's the last point. Shin versus Kayer I think is the most recent Supreme Court precedent that talks about how on the prejudice prong, it has to make a difference to the outcome of that phase of the trial. So Shin was about the mitigation phase, but it would apply just the same to this, the guilt phase. And I can get into the prejudicial nature of what a cross-examination would have looked like. I think we understand that. Yeah, so – but there's even an upstream question to that. All the deficient performance – if you grant deficient performance, I don't think there was deficiency at all. But if you grant it, that just means the judge should have asked on the record in open court, Mr. Frye, do you still plan to testify? I know you vacillated. And his answer to that would have been no because the state post-conviction court made that fact finding that he didn't want to testify. Well, I mean, that's chasing your tail. I mean that's just coming back to whether we think that's clearly erroneous. Once we decide it's clearly erroneous, we're not going to decide that gets in the way. I guess fair enough, but I don't want to just put aside the clearly erroneous point. It's – the state court has every ability to adjudicate this federal constitutional right. Could you mention one other thing that – maybe I lost track of it or our questions didn't allow you to get to it. You said it was two different days. And what I heard you initially saying was I thought you were describing the first day. That's right. And the first day of the post-conviction hearing, the two counsel testify, Frye testifies, you have fact finding. What happened the second day? A few more witnesses took the stand. These were some of the more favorable witnesses to Mr. Frye, his family members, his brother, his sister. Saying he didn't want to testify and relaying those points, right? Well, not quite in those terms. More saying things like when we talked to him pretrial, he wanted to testify, but they weren't privy to that over-the-weekend conversation that Mr. O'Brien had with Frye, for example. So I don't think they – they weren't quite as up-to-date as the counselors were in their testimony, if that makes sense. What did the state trial court – did the state trial court say I don't need to make any more findings because this doesn't change anything? Or how did that end? The state trial court wrote its opinion after the second day of testimony, and it just – it went through all of the testimony and explained that the two co-counselors who had consistent testimony with each other had the most credible explanation of the facts. The – One more thing, just forgive me for my ignorance on this, just to make sure I'm not missing something. I could imagine it potentially being a structural error if defense counsel manipulated the process or the trial court manipulated the process so that a defendant who wanted to testify couldn't. So in other words, if it's a structural error, you don't have a prejudice inquiry. So I'm just asking, am I just wrong about even having that thought? I think as a matter of party presentation, the closest they come to an argument like that is relying on chronic, which basically flips the prejudice point. And the state court's – the state court's most recent opinion is the 2019 Post-Conviction Court of Appeals. That court said that there's no chronic problem, and for good reason. There wasn't any kind of abandonment of counsel. Quite the contrary, they worked with their client all the way through, all over the weekend. You know, Friday afternoon, the other counselor without his name, I haven't mentioned as much, Mr. Whitney, apparently met with Fry four or five hours over the weekend, and then O'Brien came in on Sunday. So they were working with the – Mr. Fry all the way through, so there's not any kind of attorney abandonment of the client. I think that's sort of how the chronic claim would have to work. There isn't a freestanding structural error claim in this case, even if there was. Remember, it's ADPA. There's nothing clearly established to that end. I think we understand your arguments, Mr. Robinson. Thank you very much. Thank you for your talk. We'll hear rebuttal. Good to see you again. Okay, Mr. Vinson. Your Honors, thank you. Your Honor, let me first apologize on my inability to get the quote correct when you asked me before. I apologize about that. I understand, obviously, there's some variety in how all of us may understand the word vacillation, and people will even be on this room, I'm sure, as well, or even the word any. I do believe that just that qualifier of any, even, if there's been any vacillation, I will ask him on the record, would have triggered for counsel, at a minimum, the duty to inform the trial court that, you know, even yesterday he had wanted to testify. Getting back to my question before, if it was error not to inquire with Mr. Frey at the time of trial, whether he is waiving his right to testify or not, wasn't that error cured by having the post-conviction hearing and having, you know, having the issue decided at that point? So I have sort of two answers, or two things I want to talk about in answer. One, I don't think the post-conviction hearing cures it in this case because of the sort of unreasonable factual determinations that came out of the court there. But two, the issue, we do have a claim with. So we're not even talking about an error for failing to inquire at the time of trial. We're just totally limited on whether the findings of post-conviction are clearly erroneous. That's the only issue? So. Is that? I mean, so all this stuff about the lawyers misleading the court at the time of trial, I mean, that's kind of irrelevant, isn't it? Well, that all sort of plays into the determinations on post-conviction because sort of what the lawyers said at trial is sort of the crux of what they were inquiring about. But I want to clarify sort of the issues. I'm just wondering why we're going down that rabbit hole. It doesn't matter, that's all. That if everything is post-conviction, I mean, why we're debating what happened at trial, I don't quite understand it. Okay. Well, Your Honor, again, the post-conviction inquiry was sort of – is about what happened at trial, right? It's about – I mean, in post-conviction, the attorneys testify – the trial counsel testifies that, yes, Fry vacillated. Yes, this is what the note means. And the court's determinations in post-conviction was essentially that – or, well, I mean, it was – the state trial court in post-conviction describes the attorney's testimony as entirely credible. But if their testimony is entirely credible, then that also means that they knew Fry vacillated, that they didn't tell the trial court. But one point I want to clarify really quickly in terms of inquiry versus not, sort of the issue I've been talking about up here before and that opposing counsels discussed as well is primarily the ineffective assistance claim that stems from counsel having denied him this right. There is a separate claim we have about that the trial court should have made inquiry, but they are two distinct claims. And I think trial counsel in that moment failing to assert Fry's right, failing to notify the trial court that he had vacillated, that he had had desire to testify, what that triggers is not necessarily inquiry. I mean, of course, counsel should have told the trial court, yes, there has been vacillation, and that would have triggered a proper inquiry. But the fundamental problem of the IAC claim is that Fry, I mean, is essentially denied his counsel in that moment and then prejudice because he can't present his testimony and exercise his right. You agree, by the way, with the state that you would have to establish prejudice that had he testified, he would have had a meaningful chance of winning? I do believe, based on case law, that we would have to establish prejudice in some form. We would argue that prejudice can be presumed in this circumstance because, counsel, we believe the record indicates that. Are you making a chronic point when you say that? Yes, yes. Yeah, I apologize. How can you call that a total breakdown when they're spending all this time with him? Well, I think we have, I guess there are a few points that I think support the proposition. One, I think that trial counsel, the record indicates in our argument that trial counsel affirmatively misled the court, I think is a strong proposition. We also have, as I discussed before, the fact that from the top of trial, the defense's theory, and they testified to this in post-conviction was exclusively the voluntary manslaughter theory, that that's what they promised the jury, that they promised the jury they would hear Fry's testimony, and that they not only didn't get the voluntary manslaughter instruction, they didn't put in on any evidence to support it. And I think this all indicates that, you know, and I combined again with the evidence in the record and testimony of the negative relationship between Fry's and attorneys, indicates that there was essentially an entire breakdown here between the attorney-client relationship that sort of culminated in them essentially denying him his right to testify. So that would be our argument on that point, Your Honor. What do you think is the most egregious, ineffective assistance by counsel in this case? I think it's failure to call him, put him on the stand, or is it something else? I think the most egregious ineffectiveness is to have undermined Fry's constitutional right to testify when the evidence in the record indicates that he wanted to. You know, in the post-conviction proceedings, it wasn't just Fry who said he wanted to testify. His brother, his sister, the trial investigator, had said he had indicated that to them. You know, again, his attorneys even testified in post-conviction that he had vacillated, including just the day before. And we think that question by the court triggered for the attorneys a duty, at the very least, to inform the court that he's been back and forth, and the court could have sort of made an inquiry from there if they felt it was necessary. But effectively, by this happening in chambers, you know, Fry had no idea what was happening. Sorry, Your Honor, you look like you were going to say something. One other point I wanted to make, Your Honor, as we discussed before several times, sort of the bad stuff that would have come in if he had testified, right, on cross-examination. A lot of that stuff actually came in anyway and had already come in in the State's case. A lot of his, I don't know what the best word to use would be. I'll say colorful, although that seems gentle, sort of statements to police or things like that, all sort of came into the State's case. Most of the worst, if not all of the worst things, had already come in before the jury. All that was left and all that counsel had really, and even in their own understanding and by their own admission, was the proposition that Fry could tell his side of the story before the jury. They could determine for themselves his credibility, you know, when he was subject to cross-examination, when he was making his statements, talking about the relationship, sort of what happened that day. Now you're just making, this is just an ineffective assistance argument. It's not the one you did in your opening, so it's a little unfair to the State, and it gets per review anyway. Are you going to say this violated clearly established law to recommend not to testify? Is that the point you're making? No, no, no. That's not the point I'm making, Your Honor. No. I'm – I apologize. You're trying to make a prejudice point? Is that the point? I'm trying to make a prejudice point, and I'm trying to – So the only way you can do this is to acknowledge what still would have come in that was new. Fry's story about that day, about the loss of his property, why he had gone to the victim. No, that's damaging. You want to – you got my attention when you said all the bad stuff was already in. That's what you said, or I think you said almost all the bad stuff. Big qualification. I'm not going to keep listening to you until you explain the difference. What is it that was still at risk and did not actually come in? So under the State's theory, Fry committed – the victim died because Fry went there to kill her because she was a witness in another case. That's one of the aggravations. How about that I wanted her to die anyway? Is that going to come in? Was that already in? I think that was already in, that he had made statements like that. All of those statements? Statements to that effect were in, yeah. But the only way to support a voluntary manslaughter proposition was for Fry to be able to explain to the jury why he was actually at her house that day, the actual nature of their relationship, the property he lost, et cetera. I see my time has expired. I apologize, Your Honor. Okay. Thank you very much to both of you, Mr. Vinson and Mr. Robinson. We really appreciate excellent briefs, excellent argument. Thank you for answering our questions, which we always greatly appreciate. So the case will be submitted. Thank you. Thank you, Your Honor.